**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:03cv289-M**

| | | |
|---|---|---|
| **HOWARD MOLTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM AND** |
| **Vs.** | ) | **RECOMMENDATION** |
| | ) | |
| **GENERAL ELECTRIC CAPITAL** | ) | |
| **ASSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the court upon defendant General Electric Capital

Assurance Company's (hereinafter "GECA") Motion for Summary Judgment. In support

of its motion, GECA has filed a supporting memorandum of law and exhibits which include

affidavits, depositions, and other materials. In response, plaintiff Howard Molton ("Molton")

has filed a memorandum of law in opposition and exhibits which includes deposition

excerpts and other materials. Finally, GECA has timely filed a reply brief, which is

responsive to Molton response, and which contains additional exhibits in reply. From the

outset, the court notes and appreciates the fine manner in which respective counsel have

organized and presented their arguments and exhibits. Having carefully considered GECA's

Motion for Summary Judgment and reviewed the pleadings, the court enters the following

findings, conclusions, and recommendation.

**FINDINGS AND CONCLUSIONS**

## I.     Background

### A.     Nature of the Action

This action arises from a 2002 appointment Molton received from GECA, which provided that Molton could sell GECA's long term care insurance products as a commissioned career insurance agent and independent contractor.  The agreement between the parties was placed in writing.  Less than a year later, GECA terminated this contract for Molton's alleged failure to meet GECA's production quota, which provided that he submit a minimum of $10,000 in annualized premiums each month.  Plaintiff brings this action in contract, quasi contract (for unjust enrichment), and for violation of a state statute prohibiting unfair trade practices.

### B.     Molton's Complaint

Molton does not raise a wrongful termination claim in his complaint.  Instead, Molton contends in his Complaint that GECA breached the contract through failure to provide a promised number of sales leads or sales training.  In his responsive brief, it appears that plaintiff has altered course somewhat, and now has abandoned reliance on his allegations concerning numbers of leads and training to support his breach of contract claim, and has instead argues that GECA breached a specific promise to provide sales leads in Greenville/Spartanburg, South Carolina.  <u>See</u> Plaintiff's Response, at 14.  Such an allegation is not found in his Complaint, and Molton has not moved to amend.

Plaintiff has also asserted a claim under the North Carolina Unfair and Deceptive Trade Practices Act (hereinafter "UDTPA"). He contends that GECA's refusal to appoint him after termination of the contract to sell their product, now as an independent agent, is an unfair trade practice.

Finally, plaintiff has asserted a claim for unjust enrichment (even though the parties had a contractual relationship), contending that GECA is being unjustly enrichment through retention of commissions on policies Molton sold prior to termination of the contract. Molton asserts such a claim even though the contract provided for a two-year period before Molton would vest, which had not expired at the time the contract was terminated for failure to meet quota.

## C.     Factual Setting

Molton is an experienced business person in Henderson County, North Carolina. He owned and later sold SafeTech Security Systems, Inc., at a profit. Molton Depo., at 43-44. In that business, Molton's primary customers were residential customers. Upon selling his business, he remained a shareholder and continued to engage in sales and manage the operation for the next year. After a reduction in pay and being asked to concentrate on management rather than sales by the new owners, Molton decided to look for a new line of work so that he could "control" his own "income and destiny. Id., at 49-50. Molton resigned from the security business June 3, 2002.

By the time he left the security business, Molton had researched job opportunities in finance and insurance. Id., at 58. In conducting his research, he discovered that GECA offered opportunities for individuals to become "career agents." Id., at 59, 165. GECA sells its LTC products in a number of ways, including through independent contractors who are appointed as "career agents." Doughton Depo., at 11; Molton Depo., at 100. It is undisputed that "career agents" are independent contractors and are not employees of GECA, id., and there are a number of different levels for career agents, ranging from "representative" to "Master Marketing Specialist." GECA Ex. 2 (Molton/GECA Compensation Plan).

Upon learning of Molton's interest in GECA, he was contacted by Gayle Doughton, a career agent of GECA, who had progressed up the career path to district leader in Hendersonville, North Carolina. Doughton Depo., at 5, 14-17. GECA recruited Molton to sell its LTC products based on leads provided by GECA in Greenville/Spartanburg, South Carolina and in western North Carolina, and to sell such products based on leads he developed on his own anywhere he was licensed to do so. GECA's Ex. 6, Response to Plaintiff's Interrogatory 14.

Doughton interviewed Molton in Asheville, and the discussion centered on Molton's business and sales experience. Molton Depo., at 70. According to GECA, Doughton informed Molton during this interview and recruitment process that he would need to concentrate on generating his own leads from sources other than GECA. See generally GECA's Ex. 6, Response to Plaintiff's Interrogatory 14. As to leads, Molton testified that

a regional sales manager and a sales support leader told him that he would be eligible for up to 15 "A" leads (a hot lead) and unlimited "B" leads (a cold lead) per week. Molton Depo., at 66, 70, 93-94.

After the recruitment and interview process was completed, Molton signed a "Long Term Care Agent Sales Agreement" with GECA. GECA's Exhibit 3.[1] Molton admitted during his deposition that such agreement governs his relationship with GECA and constitutes the entire contract between him and GECA, inasmuch as it contains a merger clause. Molton Depo., at 224. The clause reads as follows:

> We and you both acknowledge that no oral or written representations were made about this Agreement or about the relationship between you and us that are not set forth in this Agreement and that this Agreement constitutes the entire contract between you and us. Your rights and our rights are governed only by this written Agreement and by any other subsequent written agreements or amendments hereto executed in accordance with the terms hereof.

GECA's Ex. 3, Contract, at § VIII(3) (Merger Clause). Molton's appointment to sell GECA's LTC products in North Carolina became effective July 29, 2004, and his appointment to sell such products in South Carolina became effective October 15, 2004, when he received his South Carolina license. Section IV(1)(c)(4) of the Contract provides that if "this agreement terminates within two years of its effective date, commissions due or payable on or after the date of termination shall be forfeited . . . ." The Contract in the

---

[1]     This contract appears to a stand-alone exhibit and is not supported by an affidavit. It is, however, referenced in Molton's deposition. Molton has not objected to its admissibility under Rule 56(e), Fed.R.Civ.P.

"premises" portion states that GECA would make "sales training available, using our best efforts to provide sales leads to you . . . ." GECA Ex. 3, at 1.

In addition to the Contract, Molton also executed a "Compensation Plan." GECA Ex. 2.[2] Section 11 of the Plan provided that Molton "must submit personally a minimum of $10,000 in annualized premiums for products each calendar month," and that failure to do so could result in termination.

It is undisputed that GECA provided Molton with a number of training opportunities during his brief career with GECA. It is also undisputed that Molton took advantage of a number of these opportunities, but also declined to attend a National Conference as well as certain ride-along-training with other more experienced agents.

It is also undisputed that GECA provided Molton with a total of 344 "A" leads and 339 "B" leads during his tenure as a GECA agent, with 49 of those leads in South Carolina. It is equally undisputed that GECA delayed providing Molton with South Carolina leads until October 2003 when he received his South Carolina license.

Five months into his work with GECA, Molton asked GECA to be removed from GECA's lead system. Molton Depo., at 229-230. Molton desired higher commissions through an agent status that did not involve receiving leads from GECA. Crosby Depo., at 87. Under the steps of the Career Agent path discussed briefly above, there were only two designations that provided what Molton wanted: Ambassador or Marketing Specialist, neither

---

[2]     See footnote 1.

of whom receive leads and who in turn receive higher commissions. Id., at 38-40. A Marketing Specialist was still a "career agent," and would be captive to GECA in that such an agent could only sell GECA products. On the other hand, and "Ambassador" was a separate contractual position, was not a career agent or captive to GECA, and could sell the LTC products of other insurance companies. Id. An agent who becomes an "Ambassador" before the expiration of the two-year vesting period for career agents cannot vest in commissions on policies sold during his tenure as a career agent. Crosby Depo., at 91. Because Molton desired to receive higher commissions as well as receive renewal commissions on previously sold policies, he chose to become a Marketing Specialist effective May 12, 2003. GECA's Ex. 12.

After requesting removal from the lead system in January 2003, Molton unilaterally stopped submitting any business to GECA. In fact, Molton sold only four policies after January 16, 2003, GECA Ex. 14., and Molton fell well below his monthly production quota of $10,000 in submitted premiums. Doughton Depo., at 80-81. On June 27, 2003, GECA informed Molton that it would terminate his contract effective July 25, 2003, GECA Ex. 13, and did so. Id.

After being terminated, Molton requested that GECA allow him to sell its LTC products as an independent agent. GECA declined this request, GECA Ex. 6, Response to Plaintiff's Interrogatory 10, and cited a company policy of not allowing terminated career

agents to sell its LTC products as independent agents for at least a year after such termination based on the costs of training and other assistance provided.  Id.

## II.  Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial.  Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*."  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56).  There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts.  Anderson, supra.  "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."  Id. at 248.  A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  Id.  The court must credit factual disputes in favor of the party resisting summary judgment and to draw inferences

favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of defendant's Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

Rule 56(e) requires "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify as to the matters stated therein." In addition to some materials that comply with Rule 56(e), plaintiff's response also contains arguments from the plaintiff's counsel, which attempt to both recast plaintiff's Complaint and dispute the evidence submitted by defendant in support of their Motion for Summary Judgment. Thus, to the extent plaintiff has failed to respond to defendant's argument, he has done so at his own peril: "A summary judgment nonmovant who does not respond to the motion is relegated to [his] unsworn pleadings, which do not constitute summary judgment evidence." Bookman v. Schubzba, 945 F.Supp. 999, 1002 (N.D. Tex. 1996)(citation omitted).

In this case, Molton appears to have abandoned the basis asserted in his Complaint for his breach of contract claim, i.e., that GECA failed to supply him with a promised number of leads and failed to provide training. As discussed below, GECA is therefore entitled to

summary judgment on such claim both substantively and through abandonment. Instead, plaintiff has recast his allegation as being for breach of contract for failure to provide promised leads in the Greenville/Spartanburg, South Carolina market. To the extent the court would be inclined to allow late amendment of the Complaint, which has not been requested, all of plaintiff's claims now rise and fall on whether there exists a genuine issue of material fact as to whether GECA promised a certain number of leads in the Greenville/Spartanburg market and whether such a promise was breached. As is reflected in the undisputed facts above, Molton's attempt to recast his Complaint to South Carolina leads narrows the time line to mid-October 2002 when he received his South Carolina license to mid-January 2003 when he asked GECA to stop sending him leads - - a three month window

## III.    Discussion

### A.    Breach of Contract Claim

#### 1.    Introduction to Plaintiff's Revised Claim

Reading Molton's response as broadly as possible, the court will find that he has abandoned his breach of contract claim based on training, and has "refined" or "narrowed" his claim based on leads to a breach of promise to provide leads in the Greenville/Spartanburg market. The court will take Molton at his word that the issue for this court is:

**Did GECA breach the contract with Molton by failing to provide leads in the Greenville/Spartanburg market?**

Molton's Response, at 14 (emphasis added).  It is now Molton's contention that he was orally promised leads in that area and that the "best efforts" language found in the "Premises" portion of the contract was breached when GECA allegedly failed to give him such leads.

### 2.    Satisfying Rule 56(e) With Admissible Evidence

The only evidence of any promise to supply leads in the Greenville/Spartanburg market is Molton's own deposition testimony : "Cady [Erickson] of GECA told me 'I have 400 leads in Greenville that I can't get work [sic] now because Loretta was sick."  <u>See</u> Plaintiff's Response, at 11.  While identifying Ms. Erickson as a person having discoverable information in his Rule 26 disclosures, Molton never deposed her or propounded any written discovery concerning any promises she may have made.

First, GECA argues that Molton's statement is inadmissible hearsay to which no exception applies.  Rule 801(d) provides in relevant part, as follows:

> A statement is not hearsay if - - - (2) The statement is offered against a party and is . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship . . . .

Fed.R.Evid. 801(d)(2)(D).  In <u>United States v. Portsmouth Paving Corp.</u>,  694 F.2d 312 (4th Cir. 1982), the Court of Appeals for the Fourth Circuit discussed the interplay between subsections (C) and (D) of Rule 801:

> The admissibility of the statement attributed to the secretary depends on an analysis of the hearsay "exceptions" contained in clauses (C) and (D) of

Rule 801(d)(2). Clause (C) provides that a statement offered against a party is not hearsay if it is "a statement by a person authorized by him to make a statement concerning the subject." This provision states the "orthodox" rule, and demands as a prerequisite to admissibility a showing based on evidence independent of the alleged hearsay that the declarant is an agent of the party with authority to speak on the subject. See 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)(2)(C)[01], at 801-151-53 (1979). Ordinarily, under this rule, an employee's admissions damaging to his employer would be inadmissible on the grounds that the employee was not authorized to make damaging admissions. See id. ¶ 801(d)(2)(D)[01], at 801-159. Likewise, in the case at bar, while there is independent evidence of the agency status of the one with whom Remington spoke, there is no evidence, beyond that implicit in the statement sought to be admitted, that she was authorized by Saunders to make the damaging admission about the "air ... in Chesapeake."

Clause (D) broadens the narrower "orthodox" rule embodied in clause (C). Clause (D) excludes from the definition of hearsay when offered against a party a statement "by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." Here, too, independent evidence establishing the existence of the agency must be adduced, but specific authorization to speak need not be shown. That the statement is made within the scope of the agency is sufficient. The issue, then, is whether the record contains independent evidence demonstrating that the woman with whom Remington spoke was an agent of Saunders speaking about a matter within the scope of her employment.

Id., at 321. According to GECA's Memorandum in Support, Ms. Erickson is its Regional Sales manager located in Chapel Hill, North Carolina, and that Molton in fact "met and interview with Kathleen Erickson" who "explained in greater detail the career agent position, including information on GECA's lead system." GECA's Memorandum in Support, at 4. Thus, the record before this court contains independent evidence showing that Ms. Erickson is an agent of GECA and that the attributed statement would concern a matter within the scope of her employment. As such, Rule 801(d)(2)(D) would direct that defendant's

tendered statement is not hearsay and would be admissible if a proper foundation was laid and if such statement was not barred by any other rule.

### 3.    Parol Evidence Rule

Finding that the statement is not hearsay, the next question is whether the statement is barred by the parol evidence rule.

> North Carolina provides for the exclusion of parol evidence both by common law . . . and by the sales article of the state's Uniform Commercial Code.
>
> * * *
>
> *Any or all parts of a transaction prior to or contemporaneous with a writing intended to record them finally are superceded and made legally ineffective by the writing.*

Smith v. Central Soya of Athens, Inc., 604 F.Supp. 518, 523-24 (E.D.N.C. 1985)(emphasis in the original; citations omitted; quoting 2 *Brandis on North Carolina Evidence* § 251 (1982)).It is undisputed on the record before the court, including the deposition of Molton, that he is an experienced, successful, a savvy business person who  understood the significance and terms of the contract he signed with GECA as well as the compensation plan.  Section VIII, paragraph 3 of the contract is a clear and unambiguous merger clause, clearly intended to make the writing a total integration of their contract: "this Agreement constitutes the entire contract between you and us."  GECA's Ex. 3, Contract, at § VIII(3) (Merger Clause).

Merger clauses were developed with the parol evidence rule in mind in order to protect the parties to the contract. North Carolina clearly recognizes the validity of merger clauses and the state courts have repeatedly enforced such clauses.

The existence of a merger clause generally provides unambiguous and unassailable evidence of the parties' intent with reference to the terms of the contract. It clearly precludes a court from admitting extrinsic evidence on a theory that the writing was not a final expression. It further creates a *rebuttable* presumption that the writing is a complete and exclusive statement of the contract terms. In order to rebut the presumption and, in effect, invalidate the merger clause, a party must offer evidence to establish the existence of fraud, bad faith, unconscionability, negligent omission or mistake in fact.

Smith, supra, at 526 (citations omitted; emphasis in the original). The statement attributed to Ms. Erickson concerning the number of leads pending in the Greenville/Spartanburg market in the summer of 2002, due to the illness of another agent, was purportedly made by Ms. Erickson during the interview process, which was prior to Molton's execution of the contract. Assuming this is a promise (which, for the reasons discussed below, it appears not to be), Molton's proffered testimony as to such alleged statement would be inadmissible under the parol evidence rule:

"The parol evidence rule prohibits the admission of parol evidence to vary, add to, or contradict a written instrument intended to be the final integration of the transaction." Hall v. Hotel L'Europe, Inc., 69 N.C.App. 664, 666, 318 S.E.2d 99, 101 (1984). "'The rule is otherwise where it is shown that the writing is not a full integration of the terms of the contract,'" Vestal v. Vestal, 49 N.C.App. 263, 266, 271 S.E.2d 306, 308 (1980) (citation omitted), or "[w]hen a contract is ambiguous, parol evidence is admissible to show and make certain the intention behind the contract," Dockery v. Quality Plastic Custom Molding, Inc., 144 N.C.App. 419, 422, 547 S.E.2d 850, 852-53 (2001).

<u>Mayo v. North Carolina State University</u>, ___ N.C.App. ___, 608 S.E.2d 116, 121 (February 15, 2005). Review of the written contract reveals no promise as to GECA providing leads in any amount or attributable to any specific location.

Molton contends that the "PREMISES" provision of the contract is part of the contract, and that the use of the term "best efforts" creates an ambiguity, which would make his parol evidence as to Ms. Erickson's alleged statement admissible. The undersigned disagrees. The premises provision of the contract appears to merely be a unilateral recitation of advice and aspirations by GECA, geared toward Molton's professional success as he is about to embark on a career in LTC sales. Put another way, the premises provision appears to be a mere expression of good will and contains no bilateral exchange of mutual promises. This is made especially clear by the language that immediately follows this preamble:

> Now, in order to reduce their mutual understandings and promises to writing, the parties agree as follows:

GECA's Ex. 3., at 1. Clearly, North Carolina law provides that purpose statements are permissive and create no affirmative duty. <u>Lassiter v. Bank of North Carolina</u>, 146 N.C.App. 264, 268-69 (2001)(Such "statements are not sufficiently definite and certain so as to give rise to an enforceable contract.")

### 4.    Four Corners

Even if the court were to assume that the "best efforts" language of the preamble amounts to a promise, the presence of such a term does not amount to ambiguity that would

require reference to parol evidence. The "best efforts" promise was to provide "sales leads" and quality LTC products to sell. The latter is not at issue and no genuine issue arises as to the former inasmuch as GECA has unequivocally shown that it provided Molton with hundreds of sales lead during his brief career with GECA. More particularly, the plain language of this additional language does not specify a number of leads or the geographical location of those leads. Reading the allegations of the Complaint, Molton's brief, and his deposition in a light most favorable to plaintiff, it is obvious that Molton did not want leads in Greenville/Spartanburg because those folks were more likely to buy product, it was because he wanted leads that were closer to his home in Henderson County to cut down on travel time and expense between appointments.

In an Email, Molton admitted that he was supplied with 49 leads in South Carolina and that "our area is overly saturated with reps." GECA's Ex. 11. Thus, not only is there no ambiguity, there is no genuine issue of material fact inasmuch as GECA fulfilled whatever additional promise could be inferred from the premises provision in that it supplied hundreds of leads to Molton during his tenure.

To establish a claim for breach of contract the plaintiff must show (1) a valid contract existed between the parties, (2) a breach of the terms of the contract, (3) the facts constituting the breach, and (4) damages resulting from such breach. Claggett v. Wake Forest Univ., 126 N.C.App. 602, 608 (1997). Giving the plaintiff every factual benefit, the undersigned finds that a valid contract existed between the parties; however, there has been no showing of a

breach of the terms of the contract by the defendant.  The undersigned shall recommend to the district court that the defendant's Motion for Summary Judgment on this issue be allowed.

**B.      Unfair and Deceptive Trade Practices Act Claim**

Originally, the underpinning of Molton's UDTPA claim was GECA's alleged refusal to allow him to sell its LTC products for the year immediately following the termination of the contract at issue in this case.  As GECA observes in its reply, Molton's UDTPA claim has undergone the same metamorphosis as has his breach of contract claim.  Molton appears to have abandoned the reappointment theory, and now contends that in allegedly breaching the contract through failure to provide leads in the Greenville/Spartanburg market, GECA has violated the UDTPA. The defendant has moved the court for summary judgment and the undersigned is of the opinion that the motion should be allowed on two grounds.  First, there is no breach for the reasons discussed above.  Second, plaintiff's contention is without merit as a matter of well-settled law as discussed below.

A UDTPA claim is governed by Chapter 75-1.1(a) of the North Carolina General Statutes, which provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."  Id.  When such provision was enacted into law in 1969, it contained the following statement of purpose:

> The purpose of this section is to declare, and to provide civil legal means  to maintain, ethical standards of dealings between persons engaged in business and between persons engaged in business and the consuming public within this State to

the end that good faith and fair dealings between buyers and sellers at all levels of commerce be had in this State.

N.C. Gen. Stat. 75-1.1(b).  See also Edmisten v. Penney Co., 292 N.C. 311 (1977).  In response to Edmisten, Section 75-1.1(b) was amended in 1977 to read "[f]or the purposes of this section "commerce" includes all business activities, however denominated . . . ."  Id.  The UDTPA is, without doubt,  a scheme regulating conduct between buyers and sellers and between businesses. See Roberson v. Dale, 464 F.Supp. 680 (M.D.N.C. 1979).  See also Liggett Group, Inc. v. Sunas, 113 N.C. App. 19, 31 (1993); Buie v. Daniel Int'l, 56 N.C. App. 445, 448, cert. denied, 305 N.C. 759 (1982).

To state a cause of action under the UDTPA, a plaintiff must allege the following:

(1)     conduct constituting an "unfair or deceptive act or practice;"

(2)     conduct "in or affecting commerce," and

(3)     that such conduct proximately caused actual injury to plaintiff.

Food Lion, Inc. v. Capital Cities/ABC Inc., 951 F. Supp. 1224, 1230 (M.D.N.C. 1996).

Generally, even an allegation of an *intentional* breach of contract will not support an action for unfair and deceptive trade practices under the North Carolina statute.  United Roasters, Inc. v. Colgate-Palmolive Co., 485 F. Supp. 1049, 1060 (E.D.N.C. 1980), aff'd, 649 F.2d 985 (4th Cir.), cert. denied, 454 U.S. 1054 (1981); Pappas v. NCNB Nat'l Bank, 653 F. Supp. 699 (M.D.N.C. 1987).  A UDTPA claim based on a breach of contract will only survive where plaintiff alleges and proves:

> substantial aggravating circumstances attending the breach.... [T]o find such factors one would probably need to demonstrate deception either in the formation of the contract or in the circumstances of its breach.

Bartolomeo v. S. B. Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989)(citations omitted).  To survive defendants' motion and satisfy the first element, plaintiff must have alleged "substantial aggravating circumstances" amounting to deception in formation of the contract or in its breach.   Under the undisputed facts there has been no showing that those factual circumstances exist herein.

In addition, the so called paralyzing career-path "dilemma" of which counsel for plaintiff argues, but on which he has submitted no evidence, appears to be dependent on a breach of the alleged promise to provide leads in the Greenville/Spartanburg market.  Again, there is no breach of contract.  Indeed, the record is undisputed that it was Molton who decided to stop taking leads after only three months of being licensed in South Carolina.  Finally, this  self-inflicted dilemma is simply not material to his claim under the UDTPA, which is now based on an alleged breach of contract, inasmuch as that claim cannot survive summary judgment.  As discussed above, Molton's breach of contract claim cannot survive summary judgment and, in turn, there can be no fraud, unfair, or deceptive act where there is no breach.  Smith, supra, at 529.

C.      Unjust Enrichment

Finally, Molton's claim for unjust enrichment has no vitality where the relationship of the parties was governed by contract.  The law in North Carolina appears to be clear that:

An implied contract is not based on an actual agreement, and *quantum meruit* is not an appropriate remedy when there is an actual agreement between the parties. Only in the absence of an express agreement of the parties will courts impose a quasi contract or a contract implied in law in order to prevent an unjust enrichment.

Whitfield v. Gilchrist, 348 N.C. 39, 497 S.E.2d 412, 415 (N.C. 1998). Plaintiff's claim in quasi contract is, therefore, barred as a matter of well settled North Carolina law.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendant General Electric Capital Assurance Company's Motion for Summary Judgment be **GRANTED**, that plaintiff's Complaint be **DISMISSED** with prejudice in its entirety, and that **JUDGMENT** be entered in favor of General Electric Capital Assurance Company, and against plaintiff, providing that plaintiff have and take nothing of this defendant.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **14 days** of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

**Signed: May 23, 2005**

Dennis L. Howell
United States Magistrate Judge